UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
RICHARD BRODY,

                    Plaintiff,        Index No. 07 CIV 7981 (RJS)

        v.

LORNA BRODY, ROBERT BRODY, and
EVELYN BRODY, 466 BROOME STREET
OF NEW YORK CITY, INC.,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS

                                              SHEINDLIN & SULLIVAN, LLP
                                              Attorneys for Plaintiff
                                               Richard Brody
                                              350 Broadway, 10th Floor
                                              New York, NY 10013

TABLES OF CONTENTS

Page

INTRODUCTION……………………………………………………………………….. 1

PRELIMINARY STATEMENT…………………………………………………………… 1

STATEMENT OF FACTS………………………………………………………………… 2

ARGUMENT……………………………………………………………………………… 5

    POINT I: THE STATUTE OF LIMITAONS HAS NOT RUN ON PLAINTIFF'S CLAIMS BECAUSE HE ONLY DISCOVERED FRAUD IN FALL 2006……………………………………………………………………….. 5

    POINT II: CONCEALMENT OF THE FRAUD………………………………… 9

    POINT III: UNJUST ENRICHMENT…………………………………………… 10

    POINT IV: CORPORATE WASTE……………………………………………… 11

CONCLUSION……………………………………………………………………………. 12

TABLE OF AUTHORITIES

Federal Cases Page

*Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983)……………………………. 6

*Dodds v. Cigna Securities, Inc.*, 12. F.3d 346, 347, 351 (2d Cir. 1993), *cert. denied*, 511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994)…………….. 7, 9

*Georgiou v. Panayia of the Mountains Greek Orthodox Monastery, Inc.*, 16 A.D.3d 998, 999-1000, 792 N.Y.S.2d 667, 669 (3d Dept. 2005)……………..... 7

*Golden Pacific Bancorp v. FDIC*, 273 F.3d 509, 519 (2d Cir. 2001)……………... 10, 11

*Guilbert v. Gardner*, 480 F.3d 140, 147 (2d Cir. 2007)…………………………… 7

*Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d 655, 663 (S.D.N.Y. 2007)…………. 9

*McCoy v. Goldberg*, 748 F. Supp. 146, 158 (S.D.N.Y. 1990)…………………….. 9

*In re Fischer*, 308 B.R. 631, 654 (E.D.N.Y. 2004)………………………………… 6

*Satterwhite v. Albert Einstein College of Medicine of Yeshiva University*, 48 U.C.C. Rep. Serv. 2d (Callaghan) 1307 (S.D.N.Y. 2002)……………………… 7

<u>State Cases</u>                                                                                                   <u>Page</u>

*Board of Managers of Society Hill II v.*
*K. Hovnanian Companies of New York, Inc.*,
271 A.D.2d 388-389, 705 N.Y.S.2d 633-634 (2d Dept. 2000)……………………      8

*City of New York v. Eisen*,
226 A.D.2d 244-245, 641 N.Y.S.2d 257-258 (1st Dept. 1996)……………………      7

*Garlick v. Tarenzi*,
152 A.D.2d 721, 723, 544 N.Y.S.2d 176, 177 (2d Dept. 1989)……………………      7

*Higgins v. Course*, 147 N.Y. 411, 418-419, 42 N.E. 6, 8 (1895)…………………..      7, 8

*Kaufman v. Cohen*,
307 A.D.2d 113, 119-120; 760 N.Y.S.2d 157, 165 (1st Dept. 2003)………………      10

*Prestandrea v. Stein*,
262 A.D.2d 621-622, 692 N.Y.S.2d 689, 691 (2d Dept. 1999)……………………      7, 8

*Saphir International, SA, v. UBS PaineWebber Inc., et al.*,
25 A.D.3d 315-316; 807 N.Y.S.2d 58, 59-60 (1st Dept. 2006)……………………      6

<u>State Statutes</u>                                                                                                              <u>Page</u>

N.Y. Bus. Corp. Law § 626 (2008)……………………………………………..            11

INTRODUCTION

Plaintiff Richard Brody ("Richard") respectfully submits this Memorandum of Law in Opposition to the Motions to Dismiss (the "Motions") of Defendants Lorna Brody ("Brody"), Evelyn Brody ("Evelyn"), Robert Brody ("Robert"), and 466 Broome Street of New York City, Inc. (the "Corporation") (collectively, the "Defendants").

PRELIMINARY STATEMENT

In a nutshell, Defendants argue that Richard's complaint should be dismissed because the sale of his shares of the Corporation in September 1995 for $1 was so obviously fraudulent that he could have discovered the fraud with reasonable diligence in 1995. Contrary to the cases they cite, Defendants argue that Richard, in the absence of any prospectus, audit, financial statement, disclosure document, public statement or letter that could have alerted him to potential fraud, should have presumed that his mother, sister, and brother were defrauding him. Furthermore, Defendants argue that Richard, a Boston, Massachusetts radio station employee, should have been aware of the market value of real estate in Soho, New York City, and should have engaged New York City real estate brokers or investment bankers to appraise the value of the Corporation and its leases.

To the contrary, despite estrangement from his family and his 1975 resignation from the family business, UFO International Inc. ("UFO"), Richard had no reason to believe that his mother, brother, and sister would defraud him of the relatively modest inheritance that he had received from his father. Richard was the only sibling who left the family business, moved in 1975 from New York to Massachusetts, and attempted to survive as a self-made man on his own in the broadcasting industry, independent of family business and politics. At the time of the 1995 stock sale, Richard had not lived in New York for two decades, aside from a year in 1984, and had no contact with the Corporation or UFO. Richard's primary contact with his family

before and after the 1995 sale of stock were weekly phone calls with his mother in which she typically stated that the Corporation was not financially successful.  Given Richard's geographic and emotional distance from his family and the fact that the Corporation was a private, family-owned business in which Richard's mother and siblings were the officers, Richard had no access to information which could have led him to believe that he was being defrauded.

Richard first learned of the fraud from his brother Robert's lawsuit in fall 2006 and from the sale of 466 Broome Street and the unjust enrichment of Defendants in April 1997.  The Motions should be dismissed.

## STATEMENT OF FACTS

Richard grew up with his older brother, Robert, younger sister, Lorna, mother, Evelyn, and father, Leo, in Oceanside, N.Y.  Complaint at ¶ 13.  Leo employed his family, including, Richard, in a number of wholesale clothing companies that he owned and operated on Elizabeth Street.  Complaint at ¶¶ 14-15.

In June 1975, after suffering through a difficult relationship with his family for years, Richard resigned from the family business and moved to Boston, Massachusetts, where, aside from the year 1984, Richard has continuously worked in the radio industry.  Complaint at ¶ 16.  In 1976, after Richard had moved to Massachusetts, Leo purchased 466 Broome Street and moved the family business from Chinatown to Soho.  Complaint at ¶¶ 14 and 16.  At some point, Richard was made a minority shareholder of the Corporation that owned 466 Broome Street.  Complaint at ¶ 18.  It appears that Richard was given fewer shares than each of the other members of the family.  Complaint at ¶¶ 2 and 38 and Complaint at Exhibit D at Exhibit A.  Richard's father passed away in September 1988.  Complaint at ¶ 19.

Between 1993 and 1995, Richard's mother repeatedly called him in Massachusetts upon short notice and demanded that he pay money to the Corporation because it allegedly needed

2

money to pay taxes.  Richard paid the money.  Complaint at ¶¶ 20-23.  During the same time period, Richard's mother repeatedly informed Richard that the Corporation was on the precipice of bankruptcy and that its financial situation was precarious at best.  Complaint at ¶ 24.

After liquidating most of his savings, Richard informed his mother that he could not afford to continually bail out the Corporation on short notice, particularly since Evelyn said that the Corporation was near bankruptcy.  Complaint at ¶ 25.  In response, Richard's mother offered to buy Richard's 13.333 shares of the Corporation for $1 and dictated a letter for Richard to sign acknowledging those terms.  Richard signed the letter.  Complaint at ¶¶ 2, 26-27 and Exhibit A.  By offering to purchase the shares for $1, Richard's mother represented that the value of the shares was $1.

Richard's sister subsequently drafted a letter accepting Richard's "offer" to sell his shares for $1, and the shares were sold.  Complaint at ¶¶ 28, 30 and Exhibits B and C.  By drafting the letter and forwarding it to Richard, Lorna, an officer of the Corporation, represented that the value of Richard's shares was $1.

The most persuasive evidence that Richard did not suspect that he was the victim of fraud was his decision, after speaking with his mother, to sell his shares, representing a significant ownership of a building in New York City for $1.  If Richard had evidence that he was being victimized by fraud, he would not have sold his shares.  Unlike his mother and siblings, Richard was not an officer of the Corporation, had lived in Massachusetts for twenty years, and had received no prospectuses, audit reports, or financial disclosures.  Richard was an ordinary man of ordinary intelligence and means living in Massachusetts.  He was not familiar with the real estate market in New York City, did not know any real estate brokers in New York City, and did not have the money to hire financial advisors to appraise the Corporation and investigate his mother's claims, his sister's letter, and his brother's silence.  *See* Affidavit of Richard Brody in

3

support of Opposition to Motions to Dismiss ("Richard Aff.") at ¶¶ 2-5.  Richard was forced to trust his family and had no reason to believe that they were defrauding him.  If he had believed that he was being defrauded, he would not have sold his shares.  Richard Aff. at ¶¶ 4 and 5.

After selling his shares, Richard's mother continued to inform him on an almost weekly basis from 1995 until January 2007 that "business was terrible" and "they were on the brink of going under."  Richard Aff. at ¶ 6; Complaint at ¶ 30.

In February 2006, Richard's older brother filed a verified petition seeking the dissolution of the Corporation.  Complaint at ¶ 31 at Exhibit D.  In November 2006, Richard's brother communicated with him in an effort to receive his support in the lawsuit against his sister and mother.  Complaint at ¶ 32.  As a result, Richard learned in December 2006 that the Corporation planned to sell 466 Broome Street for $17.6 million and that UFO, the largest tenant in the building, and Robert had been grossly underpaying their rent to the Corporation for ten years and, upon information and belief, even more grossly underpaying before that.  Complaint at ¶ 33-35.

After learning of the proposed sale, Richard spoke to his mother about receiving compensation for money that he had paid to the Corporation between 1993 and 1995.  Complaint at ¶ 35; Richard Aff. at ¶ 7.  In response, Richard's mother volunteered to pay him $1 million and put her promise in writing.

> As recently discussed, I now put in writing, my intent to give to you One Million Dollars when I receive my portion of the Building monies.  The monies represent part of my inclusion in the sale of the building – 466 Broome Street.  This will be your share due to the fact that you paid $1.00 to leave your portion *to the situation which existed some years ago*.

Complaint at ¶ 35 and Exhibit E (emphasis added); Richard Aff. at ¶ 7.  Obviously, Evelyn's guilty conscience regarding "the situation" in 1995, namely Evelyn's role in defrauding Richard out of the relatively small "portion" of his father's inheritance, had affected her.

4

A few days later, Evelyn rescinded her offer and noted that none of the proceeds of the impending sale of the Building would be distributed to her at the closing. Instead, Evelyn stated that her portion of the proceeds would be put in a trust, and she would not have $1 million to provide to Richard. Complaint at ¶ 36 and Exhibit F. When Richard telephoned his mother and requested that his family at least provide him with the approximately $50,000 that he had paid between 1993 and 1995, Evelyn responded by stating that would be unfair to Richard's siblings and suggested that Richard liquidate his son's college fund if he needed money. Richard Aff. at ¶ 8.

Subsequently, 466 Broome street was sold on April 17, 2007 for $19.5 million. Complaint at ¶ 37. At the time of the sale, Robert owned 36.11111 shares of the Corporation, Lorna owned 36.11111 shares, and the Trust of Leo Brody owned 27.77778 shares. Complaint at ¶ 38. Upon information and belief, the proceeds of the 466 Broome Street sale were split between Robert, Lorna, and the Trust of Leo Brody. Complaint at ¶¶ 39-40. Clearly, Richard's approximately 13.333 shares had been divided between Robert, Lorna, and the Trust of Leo before the sale.

<div style="text-align:center">ARGUMENT

POINT I

THE STATUTE OF LIMITATIONS HAS NOT RUN
ON PLAINTIFF'S CLAIMS
BECAUSE HE ONLY DISCOVERED FRAUD IN FALL 2006</div>

In New York, an action alleging fraud must commence within six years of the fraud or "within two years of the time the fraud was discovered or, with reasonable diligence, could have been discovered."

> An action alleging a cause of action for fraud must be commenced within six years from the time of the fraud or within two years from the time the fraud was discovered or, with ***reasonable diligence***, could have been discovered (*see* CPLR

<div style="text-align:center">5</div>

> *213[8]*; *203[g]*; *Miller v Polow*, 14 AD3d 368, 787 N.Y.S.2d 319 [2005]; *Yatter v William Morris Agency, Inc.*, 268 A.D.2d 335, 702 N.Y.S.2d 243 [2000]). In New York, "the issue of when a plaintiff, acting with reasonable diligence, could have discovered an alleged fraud turns upon whether the plaintiff possessed knowledge of facts from which he could reasonably have inferred the fraud; although a plaintiff may not shut his eyes to facts which call for investigation, *mere suspicion* will not suffice as a ground for imputing knowledge of the fraud" (*Schmidt v McKay*, 555 F.2d 30, 37 [1977]; accord *K & E Trading & Shipping, Inc. v Radmar Trading Corp.*, 174 A.D.2d 346, 347, 570 N.Y.S.2d 557 [1991]).
>
> This inquiry involves a mixed question of law and fact, and, where it does not conclusively appear that a plaintiff had knowledge of facts from which the alleged fraud might be reasonably inferred, the cause of action should not be disposed of summarily on statute of limitations grounds. Instead, the question is one for the trier-of-fact (*see Trepuk v Frank*, 44 N.Y.2d 723, 376 N.E.2d 924, 405 N.Y.S.2d 452 [1978]; *Erbe v Lincoln Rochester Trust Co.*, 3 N.Y.2d 321, 326, 144 N.E.2d 78, 165 N.Y.S.2d 107 [1957]). Indeed, "whether a person had sufficient knowledge to discover a fraud necessarily involves a dispute over state of mind and conflicting interpretations of perceived events" (*K & E Trading*, 174 A.D.2d at 347).

*Saphir International, SA, v. UBS PaineWebber Inc., et al.*, 25 A.D.3d 315-316; 807 N.Y.S.2d 58, 59-60 (1st Dept. 2006) (emphasis added). Defendants appear to argue that the fraud itself, namely, the sale of Richard's 13.333 shares of the Corporation for $1, constituted knowledge of facts from which Richard could reasonably have inferred the fraud. In other words, Defendants argue that the fraud itself should have put Richard on notice that he was being defrauded. This standard is contrary to virtually all the cases cited by Defendants.

In the cases cited by Defendant, objective, non-fraudulent facts existed to place plaintiffs on notice that fraud could be occurring. *In re Fischer*, 308 B.R. 631, 654 (E.D.N.Y. 2004) (Court notes that Defendant Fischer resisted the demands of a religious court, was excommunicated, and fled to Israel and that allegedly defrauded plaintiffs, members of the same religious community, were certainly on notice of those events and would have had duty to investigate); *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983) (prospectuses, financial

6

disclosures, audit reports, and well-publicized SEC action which preceded the filing of the complaint by more than two years, all put the plaintiff on notice of fraud); *Higgins v. Course*, 147 N.Y. 411, 418-419, 42 N.E. 6, 8 (1895) (New York State Court of Appeals reverses lower court dismissal, despite fact that plaintiff was a sophisticated Syracuse, NY businessman who worked in the same town as the secretary, treasurer, and officers of the fraudulent venture and could easily have investigated the fraud, plaintiff had no knowledge or suspicion of fraud requiring him to investigate his "friend"); *Dodds v. Cigna Securities, Inc.*, 12. F.3d 346, 347, 351 (2d Cir. 1993), *cert. denied*, 511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994) (court holds that investor is on notice for purposes of statute of limitation when provided with prospectuses and disclosure forms that she signed disclosing risks of illiquid investments); *Guilbert v. Gardner*, 480 F.3d 140, 147 (2d Cir. 2007) (defendant's failure to respond to plaintiff's repeated requests for documents should have raised suspicion); *Georgiou v. Panayia of the Mountains Greek Orthodox Monastery, Inc.*, 16 A.D.3d 998, 999-1000, 792 N.Y.S.2d 667, 669 (3d Dept. 2005) (plaintiffs on notice from date that they were locked out of property based upon forged documents in their possession); *Satterwhite v. Albert Einstein College of Medicine of Yeshiva University*, 48 U.C.C. Rep. Serv. 2d (Callaghan) 1307 (S.D.N.Y. 2002) (Satterwhite could have discovered fraud by calculations from receipts that were in his possession); *Garlick v. Tarenzi*, 152 A.D.2d 721, 723, 544 N.Y.S.2d 176, 177 (2d Dept. 1989) (defendant mailed letter to plaintiff more than two years before filing of complaint notifying plaintiff that defendant considered himself an owner of the disputed property and not the mortgagee); *City of New York v. Eisen*, 226 A.D.2d 244-245, 641 N.Y.S.2d 257-258 (1st Dept. 1996) (City charged with knowledge of sufficient facts to trigger a duty to inquire from date when witness entered into a cooperation agreement with the city and provided information regarding fraud); *Prestandrea v. Stein*, 262 A.D.2d 621-622, 692 N.Y.S.2d 689, 691 (2d Dept. 1999) (plaintiff's complaint

untimely where plaintiff received prospectuses, private placement memoranda, other documents and statements advising of losses and poor financial performance, and plaintiff filed numerous tax returns claiming substantial losses for years prior to two years before the filing of the complaint); *Board of Managers of Society Hill II v. K. Hovnanian Companies of New York, Inc.*, 271 A.D.2d 388-389, 705 N.Y.S.2d 633-634 (2d Dept. 2000) (plaintiff's expert failed to notice structural problem and failed to review City of Peekskill Building Department file that contained letter with notification of structural issue).

Similar to the *Higgins* case, *supra,* and unlike the other cases cited by Defendants, Richard possessed no knowledge of facts from which he could reasonably have inferred that his family was defrauding him and which would have triggered a duty of inquiry.  The Corporation was a private family-owned company, and Richard was not an officer of the Corporation or involved in the family business.  Defendants did not provide Richard with any prospectuses or disclosure statements.  Moreover, unlike the plaintiff in *Higgins, supra*, Richard was not a sophisticated businessman, did not live in New York City, and could not have conveniently dropped in on the Corporation or its officers whenever he felt it necessary to inquire.  Regardless, in *Higgins*, the Court of Appeals still reversed a lower court's dismissal of the complaint because the Court determined that there was "no hint or suggestion of the fraud previously perpetrated," and "Why should plaintiff have suspected his friend of such a deception?"  147 N.Y. 411, 418-419.  In Richard's case, even more so, why should Richard have suspected his mother and siblings of such deception, particularly when he had the smallest inheritance of the group?  Why would Richard have thought that in their greed his family would take everything from him when they had so much?  Although Richard, like many Americans, may have been estranged from his family, he had no suspicion that his mother and siblings were

8

attempting to defraud him of the stake in the family business that he had inherited from his father. If Richard has suspected fraud, he would not have sold his shares for $1.

POINT II

CONCEALMENT OF THE FRAUD

Defendants, officers, executives, employees, and owners of the Corporation, clearly had a fiduciary relationship with Richard, the only non-officer, minority owner in the family who lived in a different state and had no day-to-day connection to the family business. In addition, to the statements of Evelyn, the letter written by Lorna, and the silence of Robert, all of whom eventually benefitted dramatically from the sale of Richard's shares to the Corporation, Evelyn deterred Richard from investigating any possible fraud by instructing Richard almost weekly for over 11 years that the Corporation was not financially successful. *Dodds*, 12. F.3d 346, 352, *citing McCoy v. Goldberg,* 748 F. Supp. 146, 158 (S.D.N.Y. 1990).

> A claim for fraud based on concealment, in addition to a showing of an intentional failure to disclose a material fact reasonably resulting in injury, requires plaintiff to demonstrate that defendant had a duty to disclose material information. *Swersky v. Dreyer & Traub, 219 A.D.2d 321, 643 N.Y.S.2d 33, 36 (N.Y. App. Div. 1996).* Where a fiduciary relationship exists, "the mere failure to disclose facts which one is required to disclose may constitute actual fraud, provided the fiduciary possesses the requisite intent to deceive." *Whitney Holdings, Ltd. v. Givotovsky, 988 F. Supp. 732, 748 (S.D.N.Y. 1997).*

*Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d 655, 663 (S.D.N.Y. 2007).

> Alternatively, instead of an affirmative misrepresentation, a fraud cause of action may be predicated on acts of concealment where the defendant had a duty to disclose material information (*Swersky v Dreyer & Traub, 219 A.D.2d 321, 326, 643 N.Y.S.2d 33 [1996], appeal withdrawn 89 N.Y.2d 983, 656 N.Y.S.2d 741, 678 N.E.2d 1357 [1997]*). Thus, where a fiduciary relationship exists, "the mere failure to disclose facts which one is required to disclose may constitute actual fraud, provided the fiduciary possesses the requisite intent to deceive" (*Whitney Holdings, Ltd. v Givotovsky, 988 F. Supp. at 748; see also American Baptist Churches v Galloway, 271 A.D.2d 92, 100, 710 N.Y.S.2d 12 [2000]*).

9

*Kaufman v. Cohen*, 307 A.D.2d 113, 119-120; 760 N.Y.S.2d 157, 165 (1st Dept. 2003).

Defendants, including Robert, had an obligation to disclose to Richard that the total value of the Corporation in September 1995 was more than four or five dollars.  Defendants benefitted by purchasing and splitting Richard's shares, representing 13.333% of the Corporation, for $1.  At an April 2007 sale price of $19.5 million for 466 Broome Street, Defendants turned Richard's shares that they valued at $1 in September 1995 into $2,535,000 twelve years later.[1]  To the extent that Defendants maintain that the September 1995 sale was an obviously fraudulent transaction, in hindsight, Plaintiff agrees.  Unfortunately, due to the deafening silence of Robert, an officer of the Corporation, and the statements and actions of Evelyn and Lorna, Richard had no suspicion that his own family defrauded him in 1995 or thereafter.

POINT III

UNJUST ENRICHMENT

> Under New York law, for a plaintiff to prevail on a claim of unjust enrichment, he must establish (1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff. *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 79 (2d Cir. 1986) (applying New York law); *see State v. Barclays Bank, 76 N.Y.2d 533, 561 N.Y.S.2d 697, 701, 563 N.E.2d 11 (N.Y. 1990)*. The statute of limitations for unjust enrichment generally begins to run when the cause of action accrues.

*Golden Pacific Bancorp v. FDIC*, 273 F.3d 509, 519 (2d Cir. 2001).  Defendants were clearly enriched on two occasions, when Evelyn fraudulently persuaded Richard to pay money to the Corporation between 1993 and 1995, allegedly for taxes, and when they sold 466 Broome Street for 19.5 million in April 2007.  The statute of limitations for the first unjust enrichment was

---

[1] The above numbers are based upon an assumption that Richard owned only 13.333 shares of the Corporation.  Given Defendant's fraud, Plaintiffs will seek a full accounting of any shares owed Richard in discovery.

10

tolled by Defendants' fraud, misrepresentations and concealment. The second enrichment is clearly within the six year period of limitation.

In *Golden Pacific Bancorp*, the Second Circuit held that Defendant FDIC was not unjustly enriched by wrongfully accruing interest. The Second Circuit held that the FDIC was unjustly enriched when it began to pay itself interest.

> The wrongful act giving rise to restitution here was the FDIC's *payment of interest* to itself. The mere *accrual of interest* does not unjustly enrich the FDIC nor does it *accrue the cause of action*. Rather, the accrual of interest simply designates a starting point for calculation. The cause of action did not accrue or become more than speculative until the FDIC began to pay itself interest on March 15, 1991. **Indeed, before that point, the FDIC had neither been enriched nor possessed any of Bancorp's "money or property" that "equity and good conscience" would require it to return**.

*Golden Pacific Bancorp,* 273 F.3d 509, 520 (emphasis added). Accordingly, Defendants were not unjustly enriched when they purchased Richard's shares for $1 in 1995, they were unjustly enriched when they sold his shares for approximately $2,535,000 in April 2007. Plaintiff's filing is well within the six year period of limitations for unjust enrichment.

POINT IV

CORPORATE WASTE

With regard to Defendant's argument that Plaintiff does not have standing to sue for corporate waste, not only was Plaintiff a shareholder prior to 1995 when Defendants were self-dealing by providing Robert and their business, UFO, with preferential leases, but Plaintiff is a beneficiary of the Trust of Leo Brody, which continued to own shares of the Corporation after 1995. Complaint at ¶¶ 36-40 and Exhibit F.[2] N.Y. B.C.L. § 626 (2007).

---

[2] According to Evelyn Brody's letter dated December 11, 2006, "The Will provides that, at my death, the principal assets of the credit shelter trust, other than shares of UFO stock, are to be distributed in equal shares to you, Bob and Lorna (free of estate taxes and gift items." Complaint at Exhibit F.

11

## CONCLUSION

Plaintiff respectfully requests that Defendants' Motions be denied, or, in the alternative, that Plaintiff be permitted to amend the complaint.

Dated: New York, New York
       March 3, 2008

                                                  SHEINDLIN & SULLIVAN, LLP

                                                  By: _____/S/_____
                                                  Joseph Sullivan (JS1889)
                                                  *Attorneys for Plaintiff*
                                                    *Richard Brody*
                                                  350 Broadway, 10th Floor
                                                  New York, NY 10013
                                                  (646) 201-9120